SHADE, PLAINTIFF, *v.* BOWERS ET, DEFENDANTS.

Common Pleas Court, Pickaway County.

Nos. 23270, 23271. Decided June 18, 1962.

464

*Messrs. Tuttle & Britt*, for plaintiff.
*Mr. David L. Kraft* and *Messrs. Knepper, White, Richards, Miller & Roberts*, for defendants.

AMMER, J. As the above styled cases involve similar circumstances the opinion herein rendered will cover the facts presented in both cases.

This is an action for damages alleging slanderous statements which the plaintiff claims the defendants, the Mayor of the Village of South Bloomfield and the Chief of Police of that municipality, made in connection with the renewal of a liquor permit.

It appears from the petition that the plaintiff is an operator of a business in South Bloomfield known as "Del's Tavern" which is a restaurant and bar operating under a Class D-5 permit issued by the State of Ohio, Department of Liquor Control. The plaintiff alleges that the defendants at the time of the renewal of his permit made certain false, malicious and defamatory words about the plaintiff before the Department of Liquor Control in the presence and hearing of persons at said hearing, specifically the personnel of said Department of Liquor Control and as a result of such action by the defendants the Department of Liquor Control refused the renewal of the liquor permit and made the following order:

"The department finds that the Bloomfield Police Depart-

ment being the local authorities having the primary responsibility for the enforcement of Chapters 4301. and 4303., Revised Code, and for the maintenance of law and order in the community, object to the reissuance of subject permit on the ground that the premises have been operated in a manner conducive to conduct prejudicing the maintenance of public decency, sobriety and good order; and, that subject permit premises constitutes a burden on the maintenance of such public decency, sobriety and good order. The department finds that said objections are reasonable and well-founded.

"The department further notes that Harold Tosca, the mayor of Bloomfield, Ohio, has voiced an opinion on behalf of the residents of Bloomfield, Ohio, that the premises have been operated in a manner conducive to conduct prejudicing the maintenance of public decency, sobriety, and good order.

"Therefore, the department finds that a showing of good cause for the rejection of subject application, as contemplated by Section 4303.271, Revised Code, has been made. Accordingly, Application H-75056 is hereby refused and rejected."

The fifth paragraph of plaintiff's petition reads as follows:

"Plaintiff further states that his business has suffered and will continue to suffer as a result of said words and that if plaintiff suffers the loss of the permit due to such slanderous, false, and defamatory statements that he will suffer an irreparable loss that will bankrupt him all to his damages in the amount of Fifty Thousand Dollars ($50,000.00) as compensation therefore and punitive damages in the sum of Fifty Thousand Dollars ($50,000.00).

To the petition of the plaintiff in each case the defendants filed a demurrer on the ground that the petition does not state a cause of action.

The sole issue before the Court in determining whether or not a cause of action has been stated is whether the statements made by the Mayor and the Chief of Police of a municipal corporation in the discharge of their official duties to the Board of Liquor Control as to a renewal license relative to the manner that the plaintiff allegedly had conducted his business which resulted in a denial of a permit to the plaintiff is absolutely privileged?

As to the matter of privileged communications the following appears in 34 Ohio Jurisprudence (2d), 231:

"Upon certain privileged occasions where there is a great enough public interest in encouraging uninhibited freedom of expression to require the sacrifice of the right of the individual to protect his reputation by civil suit, the law recognizes that false, defamatory matter may be published without civil liability. It is not that the statements constituting libel and slander are subject to a defense, but the principle is that statements, made on a privileged occasion, from the very moment they are made, do not constitute libel or slander of which the law takes notice.

"In this connection the word 'privilege' signifies that species of immunity attaching to a person who, by reason of the circumstances of his position, is justified in uttering or writing about other matters which, if uttered or written by a third party, would be libelous or slanderous. Privilege does not depend on the words used, but on the place where and circumstances under which they were used. In all cases of privilege, the protection is complete within the range of the privilege, whatever may be the person's motives.

"Privileged communications are divided into two general classes: (1) those which are absolutely privileged and (2) those which are qualifiedly or conditionally privileged, as discussed in the following sections. Apart from the difference in the types of occasions upon which these two types of privilege apply, the distinction between the two is that the absolute privilege protects the publisher of a false, defamatory statement even though it is made with actual malice in bad faith and with knowledge of its falsity, whereas the presence of such circumstances will defeat the assertion of a qualified privilege.

"An absolutely privileged communication is one in respect of which by reason of the occasion on which, or the matter in reference to which, it is made, no remedy can be had in a civil action, however hard it may bear upon a person who claims to be injured thereby, and even though it may have been made maliciously. The absolute privilege protects the publisher of a false, defamatory statement even though it is made with actual malice in bad faith, and with knowledge of its falsity. Absolute privilege constitutes an absolute bar to an action of

libel or slander, and the immunity is afforded on the ground that it is to the public advantage that there should be no trammel on the freedom of the conduct of public affairs.

"The range of absolutely privileged communications is very limited. It has been said that the tendency of the courts is to limit the occasions of absolute privilege rather strictly to the following: (1) the legislative proceedings of sovereign states; (2) judicial proceedings in established courts of justice; (3) official acts of the chief executive officers of the state or nation; and (4) acts done in the exercise of military or naval authority. The detailed discussion of the various particular kinds of absolutely privileged communications will be found in the later parts of this division of the article.

"A publication is conditionally or qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or where the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do. This general idea has been otherwise expressed as follows: A communication made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which, without this privilege, would be actionable, and although the duty is not a legal one, but only a moral or social duty of imperfect obligation."

In 35 C. J. S., 164 to 167 the following is set forth:

"As discussed supra No. 88, it is well settled that the law recognizes a class of communications so absolutely privileged that even the existence of express malice does not destroy the privilege. The class of occasions where the publication of defamatory matter is absolutely privileged is, however, confined within narrow limits, and the courts as a rule have steadily refused to enlarge those limits. Generally speaking, absolute privilege is confined to cases in which the public service or the administration of justice requires complete immunity from being called to account for language used. It applies more directly

to matters of public concern, and it is not intended so much for the protection of those engaged in the service as it is for the promotion of the public welfare.

"Specifically, it has been said that the cases of absolute privilege are limited to three classes: (1) Proceedings of legislative bodies. (2) Judicial proceedings. (3) Communications by military and naval officers. Some authorities recognize, in addition to the classes enumerated, a fourth general class, namely, official acts of the state or of the chief executive officers of the state. Furthermore, in some jurisdictions, by force of statute, absolute privilege attaches to official proceedings authorized by law, such as a proceeding by a body clothed with quasi-judicial powers sitting in execution of a public duty. If the communication is not pertinent to the occasion, it is not within the privilege. Co-conspirators cannot shelter themselves behind the absolute privilege which a paramount public interest happens to have conferred on those members of the conspiracy in whose name the defamatory matter was published.

"It has been held that the head of an executive department of government cannot be held liable to a civil suit for damages because of official communications made by him pursuant to a legislative act and with respect to matters within his authority, by reason of any personal motive that might be alleged to have prompted his action. The protection of the rule has been further extended so as to reach and include subordinate government officers when engaged in the discharge of duties imposed on them by law. Thus it is held that public policy affords absolute protection and immunity for what may be said or written by an officer in his official report or communication to a superior when such report or communication is made in the course and discharge of official duty.

"Likewise it has been held that a resolution offered in a city council by a member, or a message by a mayor to a council announcing his veto of a bill passed by council and his reasons therefore, or defamatory matter published by a school board while acting within the scope of its power, or by a sheriff pursuant to his duty to enforce the law, or by the chairman of the federal tariff commission in connection with the transaction of the business of the commission, is absolutely privileged, provided the communication is pertinent and material.

Improper motive, bad faith, or false statement of facts is not a material question for the reason that no liability arises because thereof when involved in the exercise of official duty.

"It has been held, however, that incumbency of the office of sheriff itself does not make publications absolutely privileged even if invited, and that a budget director who was not a member of a state administrative board, but who was required by the board to investigate the financial responsibility of bidders for state contracts, was not absolutely privileged in reporting on the financial responsibility of such bidder. Furthermore, when an officer departs from official duty and indulges in defamatory statements wholly irrelevant and foreign to its scope, he is not entitled to protection."

The only Ohio case relative to the matter of absolute privilege is that of *Bigelow* v. *Brumley*, 138 Ohio St., 574, which held "that the Governor, the Secretary of State, and persons appointed by the Governor to prepare an argument against an initiated proposal to amend the Ohio Constitution have an absolute privilege and are immune from suits for damages."

In that opinion Bettman, J., stated the following:

"And what is this fundamental philosophy underlying the whole doctrine of absolute privilege? It is expressed in 3 Restatement of Torts, 224, Section 584, as follows:

"Privileges of the first class (absolute privileges) are based chiefly upon a recognition of the necessity that certain officials and others charged with the performance of important public functions shall be as free as possible from fear that their actions may have an adverse effect upon their own personal interests. To accomplish this, it is necessary for them to be protected not only from liability but from the danger of even an unsuccessful civil action. This being so, it is necessary that the propriety of their conduct shall not be indirectly inquired into either by court or jury in civil proceedings brought against them for misconduct in office. Therefore, the privilege is absolute and the protection which it affords is complete. It is not conditioned upon the honest and reasonable belief that the defamatory matter is true or upon the absence of ill will on the part of the publisher. The absolute privilege of such officials to publish defamatory matter is a part of a general privilege which

extends to all acts done by them in their official capacity which invade the interests of others.

"The immunity should be given not to protect the defamer but to assure the people the benefits of forthright action by their representatives.

"It is true that the doctrine of absolute privilege as developed in this country has had, in general, one principal restriction, that the statement be pertinent to the occasion of privilege. This is true of the judicial immunity (*Hoar* v. *Wood*, 44 Mass., 193), and of the executive immunity (*Mellon* v. *Brewer, supra*). Because, however, of the wording of the frequent constitutional provisions in this country to the effect that legislators, for what they may say in speech or debate in legislative halls, 'may not be questioned elsewhere,' the requirement of pertinence with respect to the legislative immunity has not had the same development. 1 Cooley on Torts, 533, Section 154. However, since we deem these express constitutional provisions found here to exist, we feel, that, in accordance with the development of the doctrine of absolute privilege in this country, the requirement of pertinence should be held applicable here.

"In deciding what is the proper measure of such pertinence, many courts and the editors of the Restatement of Torts have adopted substantially the view stated in the recent case of *Johnston* v. *Scharb* (Wash.), 110 P. (2d), 190, at page 194: 'The great majority of the American decisions rendered since the decision in the *Reifsnider case* (*Maulsby* v. *Reifsnider*, 69 Md., 143, 14 A., 505), have followed the suggestion therein made, and avoided using the word 'relevant' in stating the rule lest its use should give the mistaken impression that the privilege extends only to matters which are legally relevant.

"In determining whether or not matter spoken in the conduct of an action or contained in the pleadings is privileged, the test is not—Is it legally relevant? But—does it have reference and relation to the subject matter of the action?"

"The Court of Appeals in deciding that the alleged defamatory statement did not satisfy the requirement of pertinence relied upon the Ohio case of *Mauk* v. *Brundage*, 68 Ohio St., 89 at p. 97, 67 N. E., 152, 62 L. R. A., 477, in which it is said: 'To be pertinent and material it (the privileged statement)

must tend to prove or disprove the point to be established, and have substantial importance or influence in producing the proper result.' "

In that case the Court stated that "the test is—pertinence to the occasion of the privilege."

In a case decided in 1896 by the Supreme Court of the United States entitled *Spalding* v. *Vilas*, 161 U. S., 483, 16 S. Ct., 631, it was held "that the postmaster general had an absolute privilege." Justice Harlan in that opinion stated:

"We are of the opinion that the same general considerations of public policy and convenience which demand for judges of Courts of superior jurisdiction immunity from civil suits for damages arising from acts done by them in the course of the performance of their official judicial functions apply, to a large extent, to official communications made by heads of executive departments when engaged in the discharge of duties imposed upon them by law."

There has been a ruling by the various State Courts as to the matter of absolute privilege. In the case of *Catron* v. *Jasper*, 303 Ky., 598, 198 S. W. (2d), 322 (1946), the Kentucky Court held that:

"A statement by a sheriff to deputy that liquor was being stored on plaintiff's premises and illegally sold thereon, followed by issuance of search warrant and unsuccessful search for liquor, was absolutely privileged in view of officers' duty to enforce local option law, and did not render sheriff liable to plaintiff for slander."

Another case is that of *Trebilcock* v. *Anderson*, 117 Mich., 39, 75 N. W., 129, which the Court held "that a veto message of a mayor to council was absolutely privileged as long as it contained matter pertinent to the subject." In the case of *Staffney* v. *Standard Oil Co.*, 71 N. D., 170, 299 N. W., 582, the Court held "that communications made by an employer to the Unemployment Compensation Division of Workmens' Compensation Bureau under provisions of the statute requiring that such a report as to discharge of an employee showing the reason for discharge is a communication made in a proceeding authorized by law within the statute defining privileged communication and is absolutely privileged when made in manner and

form required by law and cannot be made basis for an action for libel.''

In a recent pronouncement by the United States Supreme Court (1959), in the case of *Barr* v. *Matteo*, 360 U. S., 564, 3 L. Ed. (2d), 1434, 79 S. Ct., 1335, relative to certain statements made by the Acting Director of the Office of Rent Stabilization the Supreme Court remanded the case with directions to consider the matter of qualified privilege. A portion of the headnotes of said cases reads as follows:

''The privilege accorded government officers as respects civil suits to recover for actions taken by them in the exercise of their official functions reflects the view that it is important that such officers be free to exercise their duties unembarrassed by the fear of damage suits which would consume time and energies which otherwise would be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government. (From separate opinion by Harlan, Frankfurter, Clark and Whittaker, JJ.)

''A government official who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he causes. (From separate opinion by Harlan, Frankfurter, Clark, and Whittaker, JJ.)

''What is meant by saying that a government officer, if his acts are to be privileged as respects civil suits, must be acting within his power, is that the occasion must be such as would have justified the act if the officer had been using his power for any of the purposes on whose account it was vested in him. (From separate opinion by Harlan, Frankfurter, Clark, and Whittaker, JJ.)

''The absolute privilege as respects civil suits to recover for actions taken by federal officers in the exercise of their official functions, irrespective of the motives with which those acts are alleged to have been performed, cannot be restricted to federal executive officers of cabinet rank; the privilege is not a badge or emolument of exalted office, but is an expression of a policy designed to aid in the effective functioning of government. (Per Harlan, Frankfurter, Clark, and Whittaker, JJ.; contra, Warren, Ch. J. and Douglas and Brennan, JJ.)

"It is not the title of the office, but the duties with which the particular officer sought to be made to respond in damages is entrusted, which must provide the guide in delineating the scope of the rule which clothes the official acts of executive officers with immunity from civil defamation suits. (From separate opinion by Harlan, Frankfurter, Clark and Whittaker, JJ.)"

In that opinion Justice Harlan stated that:

"The matter has been admirably expressed by Judge Learned Hand: It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected wtih the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. . . .

"The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence

that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him... *Gregoire* v. *Biddle* (CA2 NY), 177 F (2d), 579.

"We do not think that the principle announced in Vilas can properly be restricted to executive officers of cabinet rank, and in fact it never has been so restricted by the lower federal courts. The privilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government. The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierachy.

"To be sure, the occasions upon which the acts of the head of an executive department will be protected by the privilege are doubtless far broader than in the case of an officer with less sweeping functions. But that is because the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion, it entails. It is not the title of his office but the duties with which the particular officer sought to be made to respond in damages is entrusted—the relation of the act complained of to 'matters committed by law to his control or supervision,' *Spalding* v. *Vilas, supra* (161 U. S. at 498) —which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity from civil defamation suits.

"We are told that we should forbear from sanctioning any such rule of absolute privilege lest it open the door to wholesale oppression and abuses on the part of the unscrupulous government officials. It is perhaps enough to say that fears of this sort have not been realized within the wide area of government where a judicially formulated absolute privilege of broad

scope has long existed. It seems to us wholly chimerical to suggest that what hangs in the balance here is the maintenance of high standards of conduct among those in the public service. To be sure, as with any rule of law which attempts to reconcile fundamentally antagonistic social policies, there may be occasional instances of actual injustice which will go unredressed, but we think that price a necessary one to pay for the greater good. And there are of course other sanctions than civil tort suits available to deter the executive official who may be prone to exercise his functions in an unworthy manner. We think that we should not be deterred from establishing the rule which we announce today by any such remote forebodings."

The issue before the Court is whether or not the statements made by the Mayor and Chief of Police of South Bloomfield before the Board of Liquor Control are absolutely privileged? If the same are absolutely privileged then a demurrer should be sustained, however, if such are not absolutely privileged but are only qualifiedly privileged then the demurrer should be overruled.

In passing upon this question it is necessary that reference be made to the provisions of the Liquor Control Act relative to information being furnished to the Department of Liquor Control and the Board of Liquor Control. Section 4301.04 (E), Revised Code, reads as follows:

"The board may require of the director and of any officer, department, board, or commission of the state or of any county, township, or municipal officer in this state, information with respect to the social and economic effects of such chapters; and all such officers, departments, boards, and commissions shall furnish such information when requested in writing by the board."

It is clear from this provision of the statute that the Board of Liquor Control may require any municipal officer to furnish information which may be helpful to the Board in the performance of its duties which of course includes that of issuance and renewal of liquor permits.

Section 733.24, Revised Code, charges the Mayor of a municipal corporation as being the chief conservator of the peace. Sections 737.15 and 737.19, Revised Code, charge the Chief of

Police of a municipal corporation with the duty of suppressing breaches of the peace.

It is clear that the Mayor as well as the Chief of Police of a municipal corporation has certain duties in the discharge of such offices in connection with the matter of issuance and renewal of liquor permits and under Section 4301.04 (E), Revised Code, such officials can be mandatorily required to furnish information in connection with the issuance and renewal of liquor permits.

To restrict the Mayor and Chief of Police of a municipal corporation in the discharge of their duties under the law in this respect would seriously hamper the enforcement under the Liquor Control Act when they would refrain from making expressions or carrying out their duties due to the fact that they may be subject to suit for damages. Public policy certainly indicates that such officials of a municipal corporation should have a free hand in order to carry out their duties and protect the public interest. It is true that there may be some abuse of such a privilege but this of course can be corrected by the means of the electorate process for the office of Mayor. Relative to the Chief of Police there are proceedings provided for by statute for his removal in case of misfeasance in office.

Of course, there is no direct pronouncement in Ohio by the Courts relative to the matter of absolute privilege as to Mayors and Chiefs of Police of municipal corporations and the authorities in other states are rather limited in this respect.

The Court is therefore of the opinion that public policy dictates and the provisions of the Liquor Control Act require that the Mayor and Chief of Police have absolute privilege relative to statements which they make in their official duties in connection with the Liquor Control Act. The Court would point out that the absolute privilege conferred upon the Mayor and the Chief of Police is that relating solely to their duties under the facts of this case in connection with their official duties under the Liquor Control Act and does not in any way reflect an absolute privilege as to any other duty which the Mayor and Chief of Police may have as the facts of this case do not require the Court to pass upon anything other than their actions herein under the Liquor Control Act.

The facts set forth in the petition indicate that the state-

ments made by the Mayor and the Chief of Police were made in the official discharge of their duties and the same were relevant as to the matter of the renewal of the liquor permit and is a duty required of them under the provisions of Section 4301.04 (E), Revised Code, to advise the Department and Board of Liquor Control of Ohio on such matters and therefore said Mayor and Chief of Police were absolutely privileged in making the statements referred to in the petition. In view of the above conclusions of the Court relative to the statements of the Mayor and the Chief of Police being absolutely privileged the demurrer of the defendant is sustained.

Counsel for the defendants will prepare a journal entry consistent with the above ruling of the Court saving proper exceptions to the plaintiff, and grant the plaintiff a period of 20 days in which to plead further, however, if the plaintiff does not plead further within that time or does not wish to plead further then final judgment will be entered for the defendants and the case dismissed.